# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* JACKSON Minors.

UNPUBLISHED
March 14, 2017

No. 333854
Clinton Circuit Court
Family Division
LC No. 14-025425-NA

Before: RONAYNE KRAUSE, P.J., and O'CONNELL and METER, JJ.

PER CURIAM.

Respondent appeals as of right an order terminating her parental rights to her two minor daughters under MCL 712A.19b(3)(c)(*i*) (conditions leading to adjudication continue to exist), (g) (failure to provide proper care or custody), and (j) (children will likely be harmed if returned).[1] We affirm.

## I. FACTS

This case began in 2014 with referrals to Child Protective Services and investigations primarily over concerns that respondent's then-boyfriend had sexually abused one or both of the girls. There were also concerns over respondent's mental health. In an effort to avoid removal of the children, respondent underwent voluntary hospitalization and was offered a safety plan. After her discharge, however, she did not take her medications as prescribed, and she called her caseworker because she was overwhelmed with the children, then days later called again with concerns of which the caseworker could not make sense. A second hospitalization followed, and the children were removed after an emergency hearing because of respondent's mental health, noncompliance with her prescriptions, parenting skills, decision making, and management of finances. In taking jurisdiction after trial, the court explicitly mentioned respondent's poor mental health, her noncompliance with prescriptions, her poor parenting skills, her maintenance of contact with the children's father, her trouble recognizing the consequences of her actions, and her difficulty with decision making.

---

[1] The trial court earlier terminated the parental rights of the children's father, and this Court affirmed. *In re Jackson, Minors*, unpublished opinion per curiam of the Court of Appeals, issued July 12, 2016 (Docket Nos. 330194 & 330195).

-1-

Respondent was offered services, but the testimony consistently indicated that she was inconsistent at cooperating with treatment, attending counseling, and taking her prescription medicines. When the caseworker attempted to learn more about respondent's physical health concerns to see if appropriate services could be provided, respondent refused to discuss those issues with her. When respondent's therapist recommended an IQ test and set one up for her, respondent refused to appear for it. She completed the foster-care supportive visitation program, and showed some progress in her parenting, but those sessions could not be conducted at her home because the children reacted poorly in that environment. Respondent continued to have difficulties managing both girls, and was not consistent in following through when discipline was required.

Respondent suffered physical abuse at the hands of the children's father, but nonetheless chose to live with him, and was married to him for a time. Respondent had a very poor relationship with the household of her stepmother and admitted that the stepmother treated her and the children poorly, but nonetheless sometimes left the children there overnight while telling the caseworker they would be elsewhere, and on one of those occasions was assaulted by her stepsister in the presence of the children.

Respondent maintained employment through this case, but did so by way of a string of jobs lasting only a few months each. She was offered budgeting services but continued to spend her money improvidently and was often behind in paying her bills. She was nearly evicted from her apartment, and asked petitioner for help with her car payments and insurance.

Respondent posted on an internet crowd-funding site pictures of the girls along with details of the sexual abuse the younger one suffered.

Caseworkers opined that respondent consistently failed to accept responsibility for removal of her children.

## II. REUNIFICATION SERVICES

On appeal, respondent first argues that the trial court erroneously held that petitioner had expended reasonable efforts to reunify the family, on the ground that petitioner offered insufficient or inadequate services to address her barriers to reunification. However, to preserve an issue regarding the alleged inadequacy of services, a respondent in a termination proceeding must raise the issue when services are offered. *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012). In this case, respondent offers no information regarding whether she asked for any adjustments in, or additional, services during the proceedings below, see MCR 7.212(C)(7), and our review of the record has turned up no such advocacy. Thus, the issue is unpreserved and will be reviewed for plain error affecting substantial rights. *Kern v Blethen-Coluni*, 240 Mich App 333, 336; 612 NW2d 838 (2000).

Except in certain cases, when a court has taken temporary jurisdiction over a child, reasonable efforts must be made to reunite the child with the natural parents. See *Tallman v Milton*, 192 Mich App 606, 614-615; 482 NW2d 187 (1992). Where reasonable efforts toward reunification are required, but the petitioning agency has failed to allow the respondent a reasonable opportunity to participate in services, the result is a "hole" in the evidentiary record

that renders termination of parental rights improper. *In re Mason*, 486 Mich 142, 158-160; 782 NW2d 747 (2010). However, going hand-in-hand with petitioner's responsibility to expend reasonable efforts to provide reunification services is the "commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App at 248.

In this case, that respondent received abundant services is not in dispute, and much in evidence is that respondent failed to avail herself adequately of the services that were offered. Further, not only does respondent fail to show that she requested additional or other services during the proceedings below, on appeal respondent merely questions the nature of the services offered while not specifying what services could have been made available to her from which she might have benefited; she complains of petitioner "not specifically outlining goals to show progress in decision making." Respondent's vague argument disparaging the services offered and suggesting that some unspecified different mix of services might have been more effective is insufficient to invoke this Court's consideration of the issue. See *Houghton v Keller*, 256 Mich App 336, 339-340; 662 NW2d 854 (2003).

## III. STATUTORY TERMINATION CRITERIA

Respondent argues that the trial court clearly erred in concluding that petitioner proved by clear and convincing evidence that termination of parental rights was warranted under the three statutory bases put forward, a question we "review for clear error . . . ." *In re Trejo Minors*, 462 Mich 341, 356-357; 612 NW2d 407 (2000), abrogated in part by statute on other grounds as stated in *In re Moss*, 301 Mich App 76, 83; 836 NW2d 182 (2013). Clear error exists when, even if some evidence supports a finding, "a review of the entire record leaves the reviewing court with the definite and firm conviction that the lower court made a mistake." *In re Dearmon*, 303 Mich App 684, 700; 847 NW2d 514 (2014).

Again, the trial court terminated respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j), which provide:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

> \* \* \*

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> \* \* \*

(g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

Respondent's argument for this issue suggests that she was making great progress on her treatment plan, to where petitioner was looking towards reunification, when her stepsister's unprovoked assault upon her in the children's presence caused the pendulum to swing in the direction of termination. In support of this version of events, respondent cites a caseworker's testimony that respondent was granted unsupervised visitation in late July or early August 2015, and credited her with improved parenting skills and financial stability, such that "things seemed to be moving in the direction of reunification at that time." However, that caseworker also testified that the children did not respond well to visits in respondent's home, and so the visits were moved to a different location, which induced protests from respondent, who "just wasn't willing to accept that . . . they weren't ready to go back into the parental home yet," and "really kind of dismissed any of the things I was saying about why I thought it was best for them not to have them there." This testimony indicates not that reunification was actually in view, but rather that it was only starting to receive cautious consideration.

As concerns the assault, according to the testimony, in January 2016 petitioner received a call from the elementary school of one of the children that she had reported to school personnel that over the weekend her aunt had punched respondent in the face. The attendant investigation turned up that the incident took place in the home of respondent's father and stepmother. According to the then-caseworker, the stepmother "was denied placement in the past." Respondent had reported a history of physical and emotional abuse and complained about how poorly the stepmother treated her and the children. The caseworker testified:

I talked to her about needing to know where the children are at all times and we agreed to have her step uncle . . . watch the children at her house that following Friday while she worked. It was not until the Agency found out about the assault that it was discovered that [respondent] did not have [the step-uncle] come to her home and in fact allowed the children to stay the night at [her father's and stepmother's] house.

The caseworker further reported that respondent later admitted that the children had also spent a night a week earlier at that disapproved-of household. The caseworker expressed concern over respondent's decision-making ability, given that she "chose to put her children in that situation" after "a history of both herself and the children being treated poorly by [the stepmother] and a reported history of abuse as a child." This evidence that respondent elected to leave the children

-4-

in an unsuitable household well refutes respondent's suggestion that she bore no responsibility for the assault on her and the impact it had on the children.

Further, respondent does not attempt to refute the trial court's findings that she had difficulties managing both girls, was not consistent in administering discipline, resisted accepting responsibility for the removal of the children, refused an IQ test, and refused to discuss her physical health concerns. Moreover, we are concerned about respondent's defense of her decision to post detailed information about one of the children's having suffered sexual abuse on a crowd-funding site on the ground that parents commonly report news of their children on internet sites these days.

Concerning whether respondent was taking her medicines as prescribed, respondent protests that the trial court credited speculative testimony based on hearsay over witnesses who had personal bases for understanding that respondent was compliant. However, also in evidence was that respondent had made statements that her medication was not beneficial, even though the caseworker testified that medication accounted for "a huge part of . . . [any] progress . . . made[.]" The caseworker expressed concern about future medication compliance, given respondent's history and attitude.

Concerning respondent's continuing financial problems, she protests that her work hours were cut through no fault of her own, but thus describes only an ordinary workforce dynamic calling for adjustments in spending habits along with efforts to obtain other or supplemental employment. Respondent cites having established a payment plan with her landlord that allowed her to keep her apartment, but leaves unchallenged the trial court's finding that respondent was nearly evicted in the first instance, which likely occasioned the need for the special payment plan. Respondent further mentions having made significant progress toward paying off her bills, but thus admits that she had not done so yet. Respondent does not dispute that she had tended to change jobs in short order, or sought assistance with her car payments and insurance. Respondent thus fails to expose error in the trial court's counting of financial problems as among the relevant issues.

Respondent has failed to show that the trial court clearly erred in concluding on clear and convincing evidence that termination of her parental rights was warranted under MCL 712A.19b(3)(c)(*i*), (g), and (j).

IV. BEST INTERESTS

Respondent's final argument is that the trial court erred in concluding that termination of her parental rights was in the children's best interests.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012)

(citations omitted). The best-interests question is decided on the basis of the preponderance of the evidence. *In re Moss*, 301 Mich App at 83-90.

In this case, the trial court explained its best-interests determination as follows:

[T]he children clearly love their mother and there is no doubt that she loves them. But in looking at the bond, most certainly with [the older child], I'm not sure that it is a healthy one. [The older child] has role reversal, she takes on blaming herself for the situation, she wants her mother to find a father so that her mother can rest. She has anxiety, she remains in counseling, she . . . thinks it's her job to take care of her mother. She worries about whether her mother is going to be all right. And she's putting herself in a parent position, problem solving beyond what she would have to do. She has conflicted feelings about worrying about her and her sister, and then about her mother. . . . She remembers the domestic violence with her mother and [the man] who was in the home at the time [the younger child] was thought to be abused. Her . . . therapist . . . testified that she needs stability so she doesn't worry about where to go or what's going to happen. And she is very sensitive to moves and changes. In fact, she continues to struggle . . . and keep[s] asking what's going to happen to me, when are we going home, are we going home, but she did tell her mother recently that she knew she wasn't going home and she is very in tune to what's going on.

[The younger child] initially had a speech delay, that has gotten better. There are concerns about her possible sexual abuse . . . . She is aggressive . . . . She needs continued treatment, she needs consistent follow through and permanency. Both children continue to struggle emotionally and behaviorally especially with transitions and after visits and they need . . . certainty. That has not been what has been afforded to them since August 2014 through today and so I do find it is in their best interest to terminate parental rights.

Although the court did not revisit the statutory termination factors while addressing best interests, we find it obvious that the court recognized that the question before it was whether there were sufficient mitigating or redeeming aspects to respondent's parenting to render termination of her parental rights contrary to the children's best interests despite the court's conclusions with regard to the statutory factors.

Respondent acknowledges that the trial court recognized a bond between respondent and the children but thought it an unhealthy one. Of particular concern was the older child "blaming herself for the situation" and believing it was "her job to take care of her mother." Respondent recounts that "[w]hile one therapist testified that this is quite common, another testified that she was concerned about this and that the child would need more therapy," thus implying that the court should have credited the former over the latter. However, this Court does not independently assess credibility, but instead defers to the trial court's special ability to observe the witnesses. See *In re Dearmon*, 303 Mich App at 700.

Respondent additionally suggests that the court should have taken the indications that the older child was struggling over wanting to go home as indicating that it was in the child's best

interests to go home, rather than as militating against it. However, in light of the court's findings in connection with the statutory termination factors, it is apparent that the court did not think returning the child to respondent's home would be an option in the foreseeable future, and so reasonably thought it best to put an end to the child's apprehensions in that regard.

Further, as discussed above, respondent's insistence that all persons involved regarded reunification as imminent until she was assaulted by her stepsister exaggerates the extent to which there was enthusiasm for, or unanimity over, reunification before the assault, while downplaying the extent of respondent's own responsibility for that assault.

The trial court did not clearly err in concluding that termination was in the children's best interests.

Affirmed.

/s/ Peter D. O'Connell
/s/ Patrick M. Meter